IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 08-cv-02336-RPM

CHRISTOPHER L. SMITH,

    Plaintiff,
v.

BNSF RAILWAY COMPANY,
a Delaware corporation,

    Defendant.

---

## ORDER FOR SUMMARY JUDGMENT

Christopher Smith claims that he was terminated from his Trainmaster position at the Denver Terminal of BNSF Railway Company ("BNSF") on May 18, 2007, because he was then 57 years old. He seeks relief under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq*. The defendant's motion for summary judgment was heard on July 30, 2010. There are some disputed facts. Those disputes are resolved in the plaintiff's favor.

The question is whether there is an adequate evidentiary basis for a fair inference that the failures of performance given as the reason for the employer's action were pretextual and that the true motivation was a decision to replace the older trainmasters with younger ones pursuant to a policy of a management trainee program. The plaintiff was replaced by Jamaal Benison, a man in his twenties, who had completed the trainee program and was working in a temporary trainmaster assignment.

In 1975, the plaintiff began working as a brakeman for The Atchison, Topeka and Santa

Fe Railway Company. That railroad company eventually merged with and became BNSF.

From 1975 through October, 1996, the plaintiff worked in a variety of positions for BNSF or its predecessor. These were all union jobs.

On October 15, 1996, the plaintiff was promoted to the exempt (management) position of trainmaster with the BNSF in Denver, Colorado. Other trainmasters had also worked their way up to management through union jobs.

The Denver Terminal is an extensive operation. As many as 56 trains and 3,000 train cars move through the Denver Terminal on a daily basis. Trainmasters manage daily operations of the trains coming into and leaving the Denver Terminal. The responsibilities of a Trainmaster include operational oversight, oversight of train assembly, operations testing, investigations, and preparation of reports of accidents, derailments, and injuries. (See Def.'s Ex. A-3, 2007 Trainmaster Expectations and Standards.) Operations at the Denver Terminal are critical to the overall operations of the BNSF system-wide because a delay in the operations at the Denver Terminal can cause a ripple effect resulting in delays in other parts of the BNSF system.

W. Janssen Thompson, General Manager of BNSF's Colorado Division, was responsible for the operation of the Denver Terminal. Fred Rutt was the Terminal Superintendent until February, 2007 when he was replaced by Steve Thompson. The plaintiff's immediate supervisor was Matt Moyer.

Janssen Thompson stated in a declaration that during his tenure as General Manager, BNSF faced challenges in how efficiently and effectively the Denver Terminal operated. Moyer stated in his deposition that the "Denver Terminal has been a terminal that continuously had a stereotype of struggling over times." Moyer said, "our perception was managers, trainmasters and

we needed to change the trainmasters – either change their behavior, which was the ideal thing. And if they weren't going to change what was needed in Denver, then we were physically going to change people." Moyer said he believed that during the relevant time period there was "a mission statement to see a lot of turnover of personnel in Denver."

Mr. Smith was subject to the evaluation of his performance at mid-year and year end pursuant to policy affecting all trainmasters. Janssen Thompson described mid-year evaluations as a "high-level overview of performance" conducted by the people who report directly to him, along with representatives of the Human Resources department. He said that for the mid-year evaluations, the immediate supervisors rate the employees they supervise, and then there is a group discussion about whether others agree or disagree with the supervisor's rating.

Year-end evaluations are also the product of group discussion, involving a larger group. Janssen Thompson explained the year-end evaluation process as follows:

> A. For year end, we actually bring in all the departments. We bring in the supervision department heads, the engineering department heads, and the mechanical team department heads, and then we actually level all departments, front-line supervisors and managers across the division.
>
> Q. What do you mean by "level"?
>
> A. By leveling is, basically, we're doing a comparison across job positions at the same level in the organization. So all the trainmasters are evaluated on basically a level playing field to make sure that Supervisor A or Manager A is using the same criteria as Manager B to make sure we're evaluating people appropriately across all departments.
>
> * * *
>
> Q. How do you create a level playing field?
>
> A. We make sure that we review the performance of those individuals, and based on making sure that someone – that let me start all over.
> What we do is we take feedback from all the direct reports on the individual performance. Then they seek feedback from others who have had contact

-3-

with those individuals or interactions with those various supervisors to make sure that we are evaluating them the same in terms of the criteria for performance. And we have performance we evaluate them on, number one, leadership, which is one of the components, and the individual objectives, which would be on their service performance, expense management, and, also, on asset utilization.

BNSF's written employee evaluation forms provide a four-level rating scale, with available ratings of "Far Exceeds Target," "Exceeds Target," "On Target," or "Needs Improvement."

For mid-year 2006, the plaintiff received a rating of "Needs Improvement" with the following summary:

OVERALL:

--Chris has potential to achieve great things and certainly is capable of reaching an On-Target Rating for end-of-year, but will need to make steady improvement in performance and attitude to accomplish this goal in short order. Although very capable of solid performance, recent trend has lead (sic) me and others to wonder your level of commitment to the Terminal recently. I am not sure what may have caused this shift, be it not working Industry Trainmaster position or something else, it is something that we need to over come (sic) quickly. As discussed early in the year, that your peers were complaining of poor turnovers, and policing a lot of items (Missing Delays, Exception Reports, less than accurate plans, etc.) after you departed your shift.

Recommendations for remainder of year:

1) Think about what you say to management and craft employees prior to speaking and what impact this may have.

2) Dress the part of Trainmaster, like your peers.

3) When opportunities present themselves to represent the Terminal, excel in this area, be it running conference calls, operations testing, or normal day-to-day contact with employees and customers.

4) Seek Greater Responsibility as Terminal Trainmaster in the development of less seasoned trainmaster's and Yardmaster's (sic).

> 5) Maintain a steady business first manner in all contacts with employees, peers and upper management.
>
> 6) Look at the possibility that there are opportunities to improve, instead of becoming defensive in manner at these and other opportunities to improve performance.

Because all of his earlier evaluations had been at least on target, Mr. Smith was shocked. He discussed it with Moyer and talked to Jaime Holt, HR manager for the Colorado Division. Holt said the mid-year evaluations were less important than the annuals.

Mr. Smith made some changes in his conduct. He stopped wearing Hawaiian shirts as a result of the criticism.

For year-end 2006, Moyer assessed the plaintiff's performance as "On Target." Janssen Thompson testified that the plaintiff's year-end evaluation was downgraded to "Needs Improvement" after he (Janssen Thompson) questioned whether the plaintiff was performing at the same level as his peers and Rutt commented that he did not feel that the plaintiff should be rated on-target. Moyer changed the evaluation to "Needs Improvement" and wrote the following description of the plaintiff's overall performance:

> Chris did not achieve enough sustained progress to justify an other than Needing Improvement for 2006. At times Chris would tackle issue with professionalism and dedication, while at others his effort is perceived as "What is in it for me." As a Leader in BNSF and Denver Terminal, many times the needs of the organization come ahead of personal needs, while we will try to work through any conflicts, at times what is best for the group is what Leadership is all about.
>
> Chris at times displays a scheduled Management view point, case in point was on scheduling 2007 Vacations, where he successfully lobbied for seniority rule. Another example is when working the Industry Trainmaster position during the week was scheduled to have offset days on the weekend, which became an issue to resolve. Again, this is all summed up in the widely held perception that Chris is for anything that works for Chris and against anything that works against Chris, regardless of the overall cost and benefits are for the Terminal and the Team.

(Def.'s Ex. A-9, Year-End 2006 Performance Evaluation, at BNSF-Smith 0144-0145.)

Moyer testified that his job was to match the paperwork to what he was told to provide and that he did not agree that the plaintiff should have received a rating of Needs Improvement. Moyer testified that he perceived that Janssen Thompson and Rutt did not like the plaintiff and may have singled him out for that reason and because they thought he was resistant to change.

The plaintiff discussed his evaluation in meetings with Moyer, Holt, and Janssen Thompson. The plaintiff says that during his meeting with Janssen Thompson, Thompson referred to the plaintiff as a "senior trainmaster." At that time, the plaintiff was the oldest trainmaster working at the Denver Terminal, but he was not the one with the most seniority.

Other BNSF locations have positions designated as "senior trainmaster," but in Denver there is no "senior trainmaster" position. Janssen Thompson and Rutt testified that they did not recall anyone referring to the plaintiff as a senior trainmaster, but if that occurred, the word "senior" would have referred to the plaintiff's level of experience. Moyer testified that he recalled the plaintiff being referred to as a senior trainmaster, and said that term was sometimes used in Denver to refer to experienced trainmasters.

On February 12, 2007, the plaintiff was placed on a Performance Improvement Plan ("PIP"). Moyer wrote the PIP, with the assistance of human resources personnel.

The PIP directed the plaintiff to improve his performance in four categories: accuracy in reporting; meeting suspense deadlines, communication up the chain of command, and customer relations. The PIP stated: "You will have 8 weeks to complete this plan and we [Moyer and the plaintiff] will meet every two weeks to review progression against this plan. It will be your responsibility to schedule review periods at least 4 days in advance with me . . . To successfully

achieve the plan you will be required to show progress in each area of the cited plan and after successfully (sic) completion will be required to sustain these improvements in all area." (Def.'s Ex. A-10.) The PIP required the plaintiff to document his improvement and to provide specific examples of how his conduct compared to the plan.

Moyer documented his own observations of the plaintiff's job performance during the period from January 12, 2007 through April 25, 2007. Defendant's Exhibit A-11 is a chronology of Moyer's observations. Moyer's notations reflect his observations that the plaintiff showed some improvement and also continued to experience some problems.

On April 20, 2007, the plaintiff met with Moyer for their final review session under the terms of the PIP. Moyer's notes about that meeting state that the plaintiff questioned why he was ever put on a PIP. Moyer wrote: "Up until this morning I was under the impression that Chris was trying to better himself to be a better Trainmaster. During and after this meeting, I left with the impression that Chris was in it only for himself, does not understand that he ever did anything wrong and that he feels he is just being picked up (sic). After explaing (sic) length details on expectations Chris expects if not told to do something he is not accountable for its actions or inactions." (Def.'s Ex. A-11.)

On April 27, 2007, Moyer sent an email to Janssen Thompson, Steve Thompson, and Holt, recommending that the plaintiff be removed from the Trainmaster roster in Denver. (Def.'s Ex. A-19.) In that email, Moyer stated that "Chris Smith has not performed at a steady and solid level of performance to continue as a Trainmaster in Denver." The email continued:

    **FACTS:**
        **Mid Year 2006 Leadership Rating: Needs Improvement**
        **Final 2006 Leadership Rating: Needs Improvement**
        **Put on a Formal PIP: 12 Feb, initial set for 60 days**

**Required to document performance and schedule review periods every 2 weeks**
**After being placed on PIP, Chris met with HR and the GM**

**Discussion:**

- Chris continues to be in denial that his performance is not meeting expectations
- Chris missed initial deadline for first review period, sent a reminder
- During Chris's 3rd Review Period, Chris initially failed to send in information to be reviewed
- Have had several complaints by crews, mechanical forces, Customer Support and Claims that Chris has been less than professional in handling situations while performing trainmaster duties
- Chris is not accepting responsibility for actions in the Terminal. Numerous examples in past month where Chris is asked about Terminal's performance and his response has been consistent that it was "lined up when I left". Showing no signs of accountability and is in it for his shift only.
- During 4th Review Period, which Chris was pushing to be his last, he made comments to me that he still did not understand why he was a Needs Improvement
- Chris is not committed to change, only trying to move off the PIP. He constantly informs me that he cannot wait to stop documenting what he does.
- Chris failed to follow procedures in handling a First Aid Injury, namely is not putting out the Voice Mail as directed by Terminal Superintendent Steve Thompson, and second by not setting up and running the Division First Aid call to discuss what occurred.

**General Discussion:**
      I deeply regret not being successful in obtaining a turn around (sic) in Chris's performance. Chris believes that all he needs to do is be able to move box cars. Chris does not fully understand what being a Leader means to BNSF or to me. Chris has ability, but lacks the commitment to change and evolve into a better BNSF Leader. Chris has show (sic) some good things such as changing process of tying Hand Brakes at the Irondale Auto Facility. But Chris has to be told to accomplish these tasks and must be constantly guided to accomplish these types of task. Chris is confused that effort is not defined by the amount of hours you spend on a project, but by the passion and commitment to it.

(Def.'s Ex. A-19.)

In early May, 2007, Steve Thompson sent a memorandum to Janssen Thompson and two other BNSF executives, recommending that the plaintiff be removed from his role as trainmaster. That letter stated, *inter alia*, "Christopher Smith, Trainmaster Denver, has been sub-par in his performance throughout 2006 and 2007. Chris's performance issues have included, but are not limited to, lack of follow-up on requests, lack of urgency in responding to requests, and an overall lack of adequacy in the few tasks he did complete."

On May 16, 2007, the plaintiff was summoned to a meeting with Holt, Steve Thompson and Moyer. Moyer read the plaintiff a letter, informing him that his employment as a trainmaster was terminated.

On June 1, 2007, the plaintiff returned to his former Brakeman position, which he was able to do under union rules because he had maintained his seniority.

Janssen Thompson explained the replacement of Chris Smith by a much younger man, Jamaal Benison as follows:

> . . . We've been hiring people outside the organization, what we would term as management trainees and experienced front-line supervisors from outside the organization.
> We put them through a training program, and basically we put them in queue to fill vacancies. Mr. Benison, while working as a trainmaster in Denver terminal, was not on a permanent assignment. When Chris Smith's vacancy occurred, then Jamaal Benison was placed on the permanent assignment. He was working as a trainmaster, but was not on a permanent authority, so we had to do it on authority. He was on a temporary authority.

The plaintiff's first complaint of age discrimination was a letter sent to Steve Klug, assistant vice-president of human resources in August 2007.

Mr. Smith disputes the criticisms of his performance and claims that he did not receive recognition for such work as his development and distribution of the Denver Terminal Guide in March, 2006, and a recommendation for an accident prevention plan in January, 2007.

The plaintiff contends that age discrimination is shown by Janssen Thompson's use of the term "senior trainmaster" in reference to the plaintiff and by Moyer's criticizing the plaintiff for talking about retirement with other trainmasters. The plaintiff also points out that he was criticized for arguing in favor of a policy of scheduling vacation according to seniority.

The plaintiff claims that BNSF had a practice of eliminating older employees and replacing them with younger ones. The plaintiff contends that BNSF pressured older employees to leave by subjecting them to PIPs with unattainable goals. To support that contention, the plaintiff points out that Rutt (age 52) chose to take a demotion rather than be subjected to a PIP, which Rutt believed was unachievable. The plaintiff also points out that Moyer (age 42) was subjected to a PIP during the period from December 2006 through February 2007. The plaintiff also cites deposition of testimony of Janssen Thompson, who stated that from September 2006 through the beginning of 2009, three other employees in Thompson's group, all over the age of 40, were either placed on performance improvement plans, or threatened with such plans. Thompson said that those three chose not to fulfill the requirements of their plans, and either took demotions or left the company.

Janssen Thompson made the decision to remove the plaintiff from the trainmaster position based on the information supplied by Moyer. The plaintiff makes much of the testimony that Moyer did not agree with that decision. He also testified that the facts he cited and his observations of the plaintiff's performance were true. The disagreement appears to have

been that Moyer thought Chris Smith should have been given more time to improve. Accordingly, Moyer's personal view and his acceptance of his superior's direction to change the evaluation does not undermine the decision.

Performance evaluations of people working in management necessarily involve subjective assessments. Business leaders must exercise judgment giving the needs of the business first priority. There is nothing in the record to suggest that the evaluations of the other management employees was unwarranted. Whether the evaluations of the plaintiff were fair is not for this court's determination. The plaintiff has failed to present sufficient evidence to support a finding that his age was the cause of the loss of the trainmaster position. Accordingly, it is

ORDERED that the defendant's motion for summary judgment is granted. The Clerk shall enter judgment for the defendant, dismissing this civil action and for costs.

Dated: September 20, 2010

BY THE COURT:

s/Richard P. Matsch
―――――――――――――――――――
Richard P. Matsch, Senior District Judge